UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BEVERLY BARNHORST,                          Case No. 1:10-cv-526
    Plaintiff                          Dlott, J.
                                            Litkovitz, M.J.
    vs


COMMISSIONER OF                             **REPORT AND**
SOCIAL SECURITY,                            **RECOMMENDATION**
    Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 17), the Commissioner's response in

opposition (Doc. 18), and plaintiff's reply memorandum. (Doc. 19).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1957 and was 51 years old at the time of the administrative law

judge's (ALJ) decision. Plaintiff has a high school education and past relevant work experience

cleaning houses.

Plaintiff filed applications for DIB and SSI on April 7, 2006, alleging disability since

June 1, 2003, due to mental illness. (Tr. 105-10, 111-14, 129). Plaintiff's applications were

denied initially and upon reconsideration. (Tr. 67-83). Plaintiff requested and was granted a de

novo hearing before an ALJ. (Tr. 84-86). On October 8, 2008, plaintiff, who was represented by

counsel, appeared and testified at a hearing before ALJ Robert W. Flynn. (Tr. 24-58). A

vocational expert (VE), William T. Cody, also appeared and testified at the hearing. (Tr. 58-64).

On January 28, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that plaintiff suffers from the severe impairments of bipolar disorder, depression, social phobia, degenerative disc disease, and hearing loss. (Tr. 13). The ALJ found that plaintiff's impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments. (Tr. 11). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform work at the light level of exertion but with the following limitations: She is limited to frequent pushing and pulling. She cannot climb ladders, ropes or scaffolds. She is limited to occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, and crawling. She must avoid even moderate exposure to excessive noise. She must avoid exposure to moving machinery and unprotected heights. She is limited to occupations which do not require fine hearing capability. She is limited to simple, routine, and repetitive tasks in a low stress work environment with no independent judgment and where she is not responsible for the safety of others. There must be few, if any, changes in work setting. She cannot perform rapid paced work. She cannot have interaction with the public and her work would need to be isolated with only occasional supervision. (Tr. 12). The ALJ determined that plaintiff's subjective allegations of disability are less than credible. (Tr. 13). The ALJ next determined that plaintiff is unable to perform any past relevant work. (Tr. 16). However, based on the VE's testimony, the ALJ determined that plaintiff is capable of performing a significant number of jobs in the national economy including jobs as an assembler, packer and cleaner. (Tr. 16-17). Consequently, the ALJ concluded that plaintiff is not disabled under the Act. (Tr. 17).

2

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.  (Tr. 1-3).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.  The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act.  42 U.S.C. §§ 416(1), 423.  Establishment of a disability is contingent upon two findings.  First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act.  42 U.S.C. § 1382(a); 20 C.F.R. § 416.202.  Eligibility is

3

dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To

establish disability, plaintiff must demonstrate a medically determinable physical or mental

impairment that can be expected to last for a continuous period of not less than twelve months.

Plaintiff must also show that the impairment precludes performance of the work previously done,

or any other kind of substantial gainful employment that exists in the national economy. 20

C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process

for disability determinations. 20 C.F.R. § 404.1520(a) and § 416.920(a). First, the

Commissioner determines whether the individual is currently engaging in substantial gainful

activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual

is not currently engaged in substantial gainful activity, the Commissioner must determine

whether the individual has a severe impairment or combination of impairments; if not, then a

finding of nondisability is made and the inquiry ends. An impairment can be considered as not

severe only if the impairment is a "slight abnormality" which has such a minimal effect on the

individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, and work experience. *Farris v. Secretary of Health and Human*

*Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted). Third, if the individual has a severe

impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R.

Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing,

disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d) and § 416.920(d).

Fourth, if the individual's impairments do not meet or equal those in the Listing, the

Commissioner must determine whether the impairments prevent the performance of the

4

individual's regular previous employment.  If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform.  *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments.  20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing).  The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 404.1525(a) and § 416.925.  If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience.  20 C.F.R. § 404.1520(d) and § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process.  *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004).  Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990).  To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff s individual capacity to perform alternate work considering plaintiffs age, education, and background, as well as the job

5

requirements. *Wilson,* 378 F.3d at 548. *See also Richardson* v. *Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act. *See 42 U.S.C.* §§ 423(d)(l)(A); 1382c(a)(3)(A). The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments. However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult. 20 C.F.R. § 416.920a. The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id.* At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." *Rabbers* v. *Commissioner Social Sec. Admin.,* 582 F.3d 647,653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(l)). If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria": 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft* v. *Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)). The degree of limitation in the first three functional areas is rated using the following five-point scale: None, mild, moderate, marked, and extreme. *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)). The degree of

limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: None, one or two, three, four or more. *Id.* If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id.* (citing § 404.1520a(d)(1)). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *Id.* (citing § 404.1520a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.* A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before completing steps four and five of the sequential evaluation process. *Id.* (citing 20 C.F.R. § 404. 1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,* 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's]

impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404. 1527(d)(2); *see also Blakley* v. *Commissioner,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson* v. *Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527( d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.l527(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth

in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (Table), 1990 WL 94, at *3 (6th Cir. 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary*

9

*of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL RECORD

Plaintiff alleges disability primarily related to her mental impairments. In that regard, the record contains the following evidence:

Plaintiff received treatment at the Behavior Health Center from June 2004 through June 2005, where she saw psychologist Tom Davis, Ph.D. (Tr. 187-202). On June 30, 2004, Dr. Davis reported that plaintiff had mild paranoia and withdrawn behavior. (Tr. 201). She was diagnosed with bipolar disorder by history and assigned a Global Assessment of Functioning (GAF) score of 52.[1] (Tr. 199). Dr. Davis' clinical notes show that plaintiff complained of depression, anxiety, apathy, and severe fatigue. Plaintiff expressed that she wished she were dead on several occasions. (Tr. 188, 195, 200). In July 2004, plaintiff reported that she had chronic problems with staying focused, was easily distracted, and suffered from chronic exhaustion. (Tr. 198). Plaintiff's mental status exams generally showed plaintiff's mood to be

---

[1] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *See* DSM-IV at 32.

mildly depressed (Tr. 187, 191, 192, 193, 196, 198), but at times she was moderately depressed. (Tr. 187, 195). Dr. Davis assigned plaintiff GAF scores between 52 and 60. (Tr. 187-98).

Plaintiff began treating at the Central Community Health Board in August 2005 and continued treatment there through the date of the administrative hearing. (Tr. 217-241, 357-426). During the course of her treatment, plaintiff was seen by Nandini Nayar Khosla, M.D., a psychiatrist who primarily prescribed and monitored plaintiff's medication, and Dottie Boner, a licensed clinical social worker who performed psychotherapy twice a month. *Id.*

When initially assessed by Ms. Boner on August 29, 2005, plaintiff reported that she was very anxious and wanted to sleep all the time (16 hours a day). Plaintiff also had a difficult time handling her children, who lived with their father, during their weekly visits. (Tr. 231). She reported a long history of mental illness dating back to age 16 when she was hospitalized after a suicide attempt. (Tr. 232). Plaintiff was diagnosed with an anxiety disorder. Ms. Boner opined that plaintiff's functional status was very depressed and she was "basically unable to function." (Tr. 236-37).

Plaintiff was first seen by Dr. Khosla on August 31, 2005. (Tr. 229). Dr. Khosla diagnosed a mixed bipolar affective disorder, assigned plaintiff a GAF score of 60, and prescribed Abilify, Paxil, Depakote, and Wellbutrin. (Tr. 230).

On September 27, 2005, plaintiff reported to Ms. Boner that she felt weak and tired all the time, which made her want to stay in bed all the time. When she did go out, she thought people were looking at her and she would want to return home. Plaintiff also reported that she did not care about her personal hygiene, and she had difficulty reading and writing, which made

11

her feel stupid. Ms. Boner indicated that plaintiff's affect was blunt, her insight poor, and that plaintiff was able to communicate, but not well. (Tr. 411).

In October 2005, plaintiff reported that she was sleeping "a little bit less" but still sleeping more than twelve hours per day, and that she was not able to think or remember things well. Ms. Boner noted that plaintiff had increased anxiety. Plaintiff's affect was blunt with no emotion shown. (Tr. 409).

On October 28, 2005, Dr. Khosla reported that plaintiff was doing very well but was limited in function and was very reluctant to talk. Dr. Khosla also reported that plaintiff had a flat affect. (Tr. 227).

In January 2006, plaintiff presented to Ms. Boner with a blunt affect and slow speech. She stated that she did not know what she would do with her life; she had suicidal thoughts without a plan of action. She reported sleeping most days, not having the energy to leave her bed, and she had no appetite. (Tr. 404).

On May 5, 2006, Dr. Khosla reported that despite medications, plaintiff was not doing very well, and the chronicity of her condition made it impossible for her to work. (Tr. 217). Dr. Khosla submitted a portion of a county Department of Job and Family Services "Basic Medical" form wherein he reported that plaintiff had a limited capacity to manage stress, had difficulty reading and maintaining social interactions, was uncomfortable in crowds, and had limited activity in the general public because of these fears. (Tr. 218). Dr. Khosla further indicated that plaintiff needed assistance in making even minor decisions. Dr. Khosla concluded that plaintiff was unemployable for twelve months or more. *Id.*

12

On May 31, 2006, plaintiff saw her primary care physician, Douglas R. Miles, M.D. to complete paperwork relating to her application for medicaid. He reported that plaintiff was disabled due to bipolar disorder and depression. (Tr. 204, 271).

In July 2006, plaintiff was examined by Susan Kenford, Ph.D., a consultative psychologist, at the request of the Social Security Administration. (Tr. 243-49). Plaintiff appeared tense, timid, and mildly frightened and Dr. Kenford found a regressed and somewhat childlike quality to plaintiff's interactions. She seemed to worry about saying the right thing. (Tr. 244). Plaintiff reported having trouble sleeping and that she napped during the day for a couple of hours. She further reported that she generally ate only one meal per day. She did not experience humor or feelings other than emptiness, and she continued to have thoughts of suicide. (Tr. 245). Dr. Kenford reported that plaintiff presented as very anhedonic and her energy appeared low. *Id.* Dr. Kenford diagnosed major depressive disorder, recurrent; history of bipolar disorder, controlled by medication; history of psychotic symptoms, controlled by medication; and social phobia. Dr. Kenford assigned plaintiff a GAF score of 15.[2] She noted that plaintiff presented a "difficult diagnostic picture." (Tr. 247). She opined that plaintiff had a significant impairment in her ability to relate to others and in her ability to handle the stress of a work environment. (Tr. 248). Dr. Kenford also opined that plaintiff had the ability to perform simple repetitive tasks and even two-or-three part tasks, but was not able to apply those skills. *Id.* Plaintiff's ability to maintain attention, concentration and persistence was below expected levels. *Id.*

---

[2] The DSM-IV categorizes individuals with scores of 11-20 as having "Some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication." *See* DSM-IV at 32.

On August 17, 2006, state agency reviewing psychologist, Melanie Bergsten, Ph.D., reviewed the medical evidence of record and opined that plaintiff had mild restrictions in her activities of daily living and moderate restrictions in her social functioning and her ability to maintain concentration, persistence or pace. (Tr. 262). Dr. Bergsten disagreed with Dr. Kenford's opinion, noting it was not consistent with functional information in the file or notes from plaintiff's treating source. (Tr. 268). Dr. Bergsten concluded that plaintiff could perform simple and multiple step tasks in situations where duties are relatively static and changes can be explained and that plaintiff could relate to a few familiar others on a superficial basis. (Tr. 269). State agency psychologist Karla Voyten, Ph.D. affirmed Dr. Bergsten's opinion in January 2007. (Tr. 250).

On August 28, 2006, Ms. Boner noted that plaintiff appeared weepy and tired, and had poor insight and an unstable mood. (Tr. 390). Plaintiff reported that she forced herself to clean her house and was excited that she had done so, but she still had no desire to do anything and became overwhelmed when she thought of the future.

In October 2006, Ms. Boner noted that plaintiff "appears to be 'stuck' in a childlike position with her family and foster mom." (Tr. 388). Plaintiff also noted experiencing tremors purportedly as a side affect of her medication and Ms. Boner advised plaintiff to schedule an appointment with Dr. Khosla to discuss such side effects. (Tr. 387). Ms. Boner also reported that plaintiff was "looking a bit unkept" and "continues to have marginal cognitive skills that significantly impact her ability to work." (Tr. 386).

In February 2007, plaintiff reported her mentally retarded brother died. Her other brother had surgery for a brain tumor. Her mood was stable and affect was sad. (Tr. 383).

14

In March 2007, plaintiff traveled to Dallas, Texas for her brother's funeral. She was anxious and fearful on the plane and got sick upon arrival in Texas. She described the trip as "awful." Ms. Boner noted that plaintiff continued to grieve the loss of her mentally retarded brother. Ms. Boner further noted that plaintiff's mood was less stable and more vulnerable. (Tr. 382).

On May 7, 2007, plaintiff was described as "doing better" but reported that she felt numb. She liked her manic state as she "got more done." (Tr. 380). She felt dull and did not think she felt what she should toward her daughters. She reported suicidal thoughts several times a week. (Tr. 380). In June and July 2007, plaintiff began dating an acquaintance and as a result was taking better care of her body and felt more motivated to do things. (Tr. 375-77). By November 2007, plaintiff's relationship was over. (Tr. 371).

In January 2008, plaintiff reported feeling bored and not doing much. Ms. Boner noted that plaintiff had made no progress in increasing social interaction. (Tr. 368). In March 2008, plaintiff had an opportunity to go visit friends in Texas, she discussed her fears about flying and being in a small, closed space. (Tr. 366). In June 2008, plaintiff reported poor sleep and she was lethargic. (Tr. 360). In July 2008, Ms. Boner noted that plaintiff was shaking visibly and expressed some paranoid thinking. (Tr. 358). In August 2008, Ms. Boner observed that plaintiff was anxious and her left arm was shaking more than it usually did. (Tr. 357).

In October 2008, Dr. Khosla completed a Medical Assessment of Ability to Do Work-Related Activities form. Dr. Khosla opined that plaintiff had mostly poor or no mental ability to perform a variety of work-related functions due to cognitive limitations, depression, and severe anxiety. (Tr. 437-39).

15

On October 3, 2008, Ms. Boner gave a recorded statement in the form of a deposition in response to questioning by plaintiff's former attorney. (Tr. 427-35). Ms. Boner noted that although plaintiff has a current diagnosis of bipolar disorder, her treatment of plaintiff indicates that plaintiff suffers from "very dramatic clinical depression." (Tr. 430). She opined that plaintiff does not function well enough to sustain employment because of her limited cognitive ability, significant depression, and significant deficits in her social skills and communication abilities. *Id.* Ms. Boner indicated that she agreed with the previous disability assessments by Dr. Khosla in light of plaintiff's inability to complete tasks and think through concepts. (Tr. 430-31). In response to questioning relating to plaintiff's severe anxiety, Ms. Boner stated:

> A patient who has the kind of severe anxiety that Bev has, becomes immobilized and unable, simply unable to do the next thing. And sometimes unable to do anything - in social situations, in groups, even in a church situation, Bev will have to physically remove herself because her anxiety is at such a high level and while I do see Bev having made some improvements in the last three years, I haven't seen any measurable change in that anxiety.

(Tr. 431).

Ms. Boner added that plaintiff decompensated when faced with increased stress. (Tr. 432). Ms. Boner explained that plaintiff's functioning deteriorates "like a rock in the bucket" when faced with added stress. (Tr. 432). Ms. Boner further noted that plaintiff was a very poor reader and may have borderline intelligence. (Tr. 434).

The record also contains the following evidence relating to plaintiff's physical impairments. Treatment notes from plaintiff's primary care physician, Douglas R. Miles, M.D. indicate that plaintiff reported breast/chest pain in September 2003. (Tr. 209). Dr. Miles found no abnormalities on physical examination at that time. (Tr. 209). In January 2004, plaintiff

16

complained of fatigue. (Tr. 208). In August 2004, plaintiff saw Dr. Miles complaining of low back and abdominal pain. (Tr. 207)

Plaintiff received primary health care at the Walnut Hills Health Center from March 2007 through July 2008. (Tr. 307-55). She was treated for a back mole, back pain, kidney cysts, and gastric problems. (Tr. 321-27).

An abdominal ultrasound in April 2007, revealed a kidney cysts and a fatty liver. (Tr. 273). A chest x-ray in July 2007 was normal after plaintiff complained of rib pain. (Tr. 274-76). Plaintiff had surgery on her left elbow in September. (Tr. 278). A colonoscopy in January 2008 was normal. (Tr. 285-86). An abdominal ultrasound revealed abnormalities to her liver and left kidney in April 2008. (Tr. 293). An abdominal CT scan in May 2008 showed kidney lesions, suggested a fatty liver with possibly a liver cyst as well, and diverticulosis with no inflammatory change. (Tr. 296-99). An abdominal CT scan in June 2008 showed a fatty liver and kidney lesions. (Tr. 301-02). An x-ray of the lumbar spine from June 2008 revealed facet arthropathy at L4-L5 and L5-S1. (Tr. 300).

### PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she was unable to work because she was "extremely anxious." (Tr. 29). She testified she also suffered from depression. (Tr. 30). Driving made plaintiff nervous and caused panic attacks. She described her panic attacks as if she cannot breathe and her heart races. (Tr. 30-31). Due to her depression, plaintiff stated that she was tired a lot and she cried often. (Tr. 30). She also testified that she had difficulties with reading and writing. (Tr. 27). Plaintiff testified that she also suffers from back pain, "stomach trouble," right leg problems, frequent vomiting, and migraine headaches that lasted four

17

hours. (Tr. 30-33). Plaintiff testified that she has also noticed hearing loss in her left ear. (Tr. 52).

As to her daily activities, plaintiff testified that she spent most of her day in bed and denied doing significant housework. (Tr. 38-40). She only showered about every three days, she did not cook often, and she ate simple foods like soup or waffles. (Tr. 39). She did laundry but only vacuumed about once a month. (Tr. 40). She took out her trash and cleaned her bathroom and kitchen. *Id.* She did not go out as much as she used to because it was expensive. (Tr. 43). She saw various family members during the week. (Tr. 47-48). Plaintiff testified that she experienced flashes of suicidal thoughts every day, felt very anxious when she left her home, and wondered if she will make it back home. (Tr. 56-57). Plaintiff has two children that reside with her ex-husband. Plaintiff visited her children one day per week for 4 hours at her foster mother's house. (Tr. 38).

## OPINION

Plaintiff assigns three errors in this case. First, plaintiff contends the ALJ improperly weighed the medical source opinions. Second, plaintiff argues that the ALJ erred by not including limitations for each of plaintiff's "severe" and "non-severe" impairments in his RFC determination. Third, plaintiff asserts the ALJ improperly evaluated her credibility. For the reasons that follow, the Court finds the decision of the ALJ is not supported by substantial evidence and should be reversed and remanded for further proceedings.

## I. The ALJ improperly weighed the medical source opinions thereby requiring remand in this matter.

Plaintiff contends the ALJ failed to accord proper weight to the opinions of her treating psychiatrist and treating therapist, Dottie Boner, in assessing plaintiff's residual functional

capacity. Plaintiff argues that the ALJ, in rejecting their assessments, placed undue emphasis on plaintiff's activities and failed to consider the length of time she was able to perform those activities. Plaintiff further asserts the ALJ erred by according no weight to the opinion of consultative examining psychologist, Dr. Kenford.

### A. Plaintiff's treating sources at Central Community Health Board

At the time of the hearing, plaintiff had been treating at the Central Community Health Board for over three years. During the course of her treatment, plaintiff was seen by Dr. Khosla, a psychiatrist, who primarily prescribed and monitored plaintiff's medication and Dottie Boner, a licensed clinical social worker, who performed psychotherapy twice a month. (Tr. 217-241, 307-426).

In May 2006, Dr. Khosla opined, "Despite medications, [Plaintiff] is not doing very well, and the chronicity of her condition makes it impossible for her to work." (Tr. 217). He further explained that plaintiff "has a limited capacity to manage stress. She has difficulty making and maintaining social interactions. [Plaintiff] is uncomfortable in crowds and limits activity in the general public because of these fears. She needs assistance in making even minor decisions." (Tr. 218). Dr. Khosla concluded that plaintiff was "unemployable" for twelve months or more. (Id.). In October 2008, Dr. Khosla completed a Medical Assessment of Ability to Do Work-Related Activities form. Dr. Khosla opined that plaintiff had mostly poor or no mental ability to perform a variety of work-related functions due to cognitive limitations, depression, and severe anxiety. (Tr. 437-39). Dr. Khosla also reported that plaintiff has limited cognitive abilities and that her comprehension is poor. These difficulties limited plaintiff's ability to process concepts, perform memorization, and organize her thoughts. (Tr. 438). Dr. Khosla

19

opined that plaintiff would experience interruptions in the workday as her anxiety can at times immobilize her and slow or stop her functioning. (*Id.*). Dr. Khosla also reported that plaintiff would experience frequent episodes of intrusive thinking in the workplace as a result of her psychiatric impairments. (*Id.*). Dr. Khosla reported that plaintiff was likely to miss at least three days per month from work because her depression and anxiety manifest themselves in plaintiff's inability to complete tasks such as activities of daily living. (*Id.*).

Also in October 2008, Ms. Boner gave a recorded statement to plaintiff's counsel wherein she indicated that she felt that plaintiff was clinically depressed. (Tr. 427-35). She further opined that plaintiff does not function well enough to sustain employment because of her limited cognitive ability, significant depression, and significant deficits in her social skills and in her communication abilities. *Id.*

The ALJ gave "no weight" to the assessments of Dr. Khosla and Ms. Boner. With respect to Dr. Khosla's 2006 assessment, the ALJ concluded Dr. Khosla's disability opinion was inconsistent with "the other substantial evidence, including the longitudinal view" and his own clinical notes which report that plaintiff was "doing well" on "several" occasions. (Tr. 15). The ALJ further found that Dr. Khosla's 2008 assessment was "inconsistent with other substantial evidence, including his own clinic notes." (Tr. 15). In support of this conclusion, the ALJ noted that Dr. Khosla's progress notes "showed the claimant socializing, getting a boyfriend, getting out with people, traveling to other cities, traveling out of the country, taking walks every day, and related activities inconsistent with that opinion." *Id.* Furthermore, the ALJ found Ms. Boner's assessment was not supported by references to her treatment history and was "inconsistent with other substantial evidence ... showing much higher levels of functioning." (Tr. 16). The ALJ

20

further found that as a social worker, Ms. Boner is not an acceptable medical source for Social Security disability purposes.

Contrary to the opinions of plaintiff's treating psychiatrist and therapist that plaintiff is unable to work, Dr. Bergsten, a non-examining state-agency psychologist, found that plaintiff suffered mild to moderate limitations as a result of her mental impairments and was capable of performing simple and multiple step tasks in work that was relatively static. The ALJ concluded that Dr. Bergsten's findings were supported by the evidence of record and gave significant weight to the opinion of the state agency psychologist. (Tr. 15).

The ALJ's conclusion that Dr. Khosla and Ms. Boner's findings were entitled to "no weight" because they were inconsistent with their own clinical findings is without substantial support in the record and is based upon the ALJ's selective review of the evidence. Notably, substantial evidence is determined from the record as a whole. *See Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984). As such an "ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Admin.*, 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).

The ALJ's rejection of the treating physician's opinions in this respect is not supported by substantial evidence. Although the ALJ is not bound by a treating physician's opinion, he must set forth in his decision a reasoned basis for rejecting the opinion. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). *See also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986) (failure to specify the reason for giving a treating physician's opinion no weight is

21

reversible error); *Jones v. Heckler*, 760 F.2d 993, 997 (9th Cir. 1985)(ALJ must set forth "specific, legitimate reason[s]" for disregarding a treating physician's opinion), both cited with approval in *Shelman*, 821 F.2d at 321. The ALJ must articulate "good reasons" for not giving weight to a treating physician's opinion and such reasons must be based on the evidence of record. *See Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ took issue with Dr. Khosla and Ms. Boner's disability assessments in light of plaintiff's activities including "getting a boyfriend, getting out with people, traveling to other cities, traveling out of the country, taking walks every day, and related activities inconsistent with that opinion." (Tr. 15). In this regard, the ALJ's conclusion that Dr. Khosla and Ms. Boner were entitled to no weight in light of plaintiff's activities ignores the objective findings[3] of such doctors, as well as those of the other examining physicians of record. These include clinical findings such as blunted, constricted, or flat affect (Tr. 360, 366, 380, 396, 399, 400, 401, 404, 406, 409, 411); depressed or sad mood (Tr. 187, 190, 191, 192, 193, 195, 196, 222, 225, 393, 399, 402); labile mood (Tr. 382); unstable mood (Tr. 390, 402); tearful (Tr. 188, 382, 384, 390, 393, 402); paranoia (Tr. 358); anxious or nervous mood (Tr. 188, 195, 357, 358, 396, 402, 409, 407); disheveled appearance (Tr. 382, 386, 396, 401); suicidal ideation (Tr. 188, 195, 200, 380, 390, 404); and poor insight (Tr. 386, 399, 402, 405, 406, 407, 408, 410, 411). These clinical findings support the opinions Dr. Khosla and Ms. Boner. Yet, the ALJ failed to acknowledge

---

[3] Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

such findings and, instead, selectively cited to plaintiff's "getting a boyfriend, getting out with people, traveling to other cities, traveling out of the country, taking walks every day, and related activities inconsistent with that opinion." (Tr. 15). The ALJ's conclusion in this regard misstates the evidence of record. Notably, such activities must be viewed in the context of Dr. Khosla and Ms. Boner's treatment notes as a whole and not in isolation as done by the ALJ.

With respect to plaintiff's "getting a boyfriend" the record shows that plaintiff began a romantic relationship with a man she had already known for several years, and that the romantic relationship was short-lived, from June through approximately October 2007. (Tr. 371-377, 422) Furthermore, while the ALJ reported that plaintiff was "taking walks every day" (Tr. 15), plaintiff's attempts at exercising are mentioned infrequently in the therapy notes. (Tr. 376, 379, 388). More importantly, a review of those notes in context reveal clinical signs and findings which temper the ALJ's positive spin on the plaintiff's exercise activities. For example, while therapy notes in June 2007 show plaintiff was "swimming regularly," the notes also reveal that plaintiff was very fatigued by 4:00 p.m. each day. In terms of her affect, she displayed "some lethargy and was less animated" and her insight was rated "poor" with "no improvement noted." (Tr. 378). Notes from May 21, 2007 indicate plaintiff was "trying to eat better and exercise" (Tr. 379), but notes from two weeks earlier show plaintiff displayed a dull affect and did not "think she feels what she should towards her daughters." Plaintiff's insight was poor and she reported suicidal thoughts several times per week. (Tr. 380).

Furthermore, plaintiff's trips to Dallas, Texas, were made to visit her brother and sister-in-law around the time that her brother was undergoing surgery for a brain tumor, and another trip was around the Christmas holidays. (Tr. 382-384). Plaintiff noted that she was

23

"very anxious and fearful on the plane" and described her trip to Texas in March 2007 as

"awful." (Tr. 382). Additionally, plaintiff went on a trip to Mexico with her sister-in-law in

August 2008; however, plaintiff reported that she was less anxious because of the language

barrier because she did not have to worry about strangers finding her "stupid." (Tr. 358).

While it is true that at certain times Ms. Boner reported that plaintiff was socializing

more and doing things with others, Ms. Boner also indicated that plaintiff had to push herself to

engage in social activities such as attending church, going to Kings Island with her daughters, or

getting on an airplane and flying to another city. Ms. Boner's notes indicated that plaintiff

"pushes herself to do more social activities rather than stay at home." (Tr. 395). Although

plaintiff reported that she had a good trip to Kings Island with her daughters, she was

"apprehensive" about having to care for the children by herself and also reported "fighting

feelings of depression." (Tr. 393-394).[4] Treatment notes from December 2005 indicate that

plaintiff "continues to be uncomfortable when she is out in the community. She feels

overwhelmed and wants to return home. [Plaintiff] pushes herself beyond her comfort level to

go to church." (Tr. 406). Moreover, on January 22, 2008, Ms. Boner noted that plaintiff has

made "[n]o progress in increasing social interaction." (Tr. 368).

The ALJ's selective presentation of the more positive aspects of the therapy notes does

not negate the findings set forth in the remainder of the therapy notes which support the

assessments of Dr. Khosla and Ms. Boner, and does not constitute "good reasons" for rejecting

---

[4] That same progress note also states that plaintiff reported "not wanting to get up [in the morning] and not wanting to live any more." (Tr. 393). Her therapist noted that plaintiff "pretends" for people, but felt "very empty and worthless." (Tr. 393). Her therapist also reported plaintiff's mood was unstable, her affect was "tearful, in anguish about her life," and her insight was "poor." (Tr. 393).

their assessments. As such, the ALJ's rejection of their assessments is not supported by substantial evidence. *See Howard v. Commissioner*, 276 F.3d 235, 240-41 (6th Cir. 2002).

The ALJ also gave "no weight" to the opinion of Ms. Boner, plaintiff's therapist, because social workers are not "acceptable medicals sources." (Tr. 16). Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) and § 416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *Id*.[5] Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id*. Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id*. *See also Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case. SSR 06-03p.

---

[5] SSR 06-03p provides that the Commissioner will consider all available evidence in an individual's case record, including evidence from medical sources. The term "medical sources" refers to both "acceptable medical sources" and health care providers who are not "acceptable medical sources." *Id*. (citing 20 C.F.R. § 404.1502 and § 416.902). Licensed physicians and licensed or certified psychologists are "acceptable medical sources." *Id*. (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)). Licensed social workers are not "acceptable medical sources" and instead fall into the category of "other sources." *Id*. (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)).

Additionally, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an acceptable medical source, including the medical opinion of a treating source ... if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06-3p. The Social Security regulations likewise recognize the need for longitudinal evidence and that a claimant's level of functioning may vary considerably over time. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2). Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of her impairments over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (D)(2).

In this case, Ms. Boner evaluated plaintiff at least per twice per month for over three years. Ms. Boner provided all of her therapy notes (Tr. 231-242, 356-426) and also provided deposition testimony that thoroughly explained her treatment notes in response to questioning from plaintiff's former attorney. (Tr. 427-435). Looking at the evidence of record, it appears that Ms. Boner's lengthy course of treatment with plaintiff placed her in a knowledgeable position to assess plaintiff's ability to function over time. *See* Social Security Ruling 85-16, 1985 WL 56855, at *4 (other source evidence, including reports of social workers, "may play a vital role in the determination of the effects of impairment ...."); *White v. Commissioner of Social Security*, 302 F.Supp.2d 170, 175 -176 (W.D.N.Y. 2004) (ALJ erred by not giving appropriate weight to opinion of plaintiff's social worker; although a social worker is not an "acceptable medical source" under regulations, ALJ should have considered social worker's records as "other source" evidence).

Instead of accounting for the variations of plaintiff's level of functioning over an extended period of time, the ALJ gave "significant but not controlling weight" to the August 2006 assessment of Dr. Bergsten, a non-examining state agency psychologist, in determining plaintiff's residual functional capacity to the exclusion of the evidence subsequently entered into the record that supports the treating sources' opinions. (Tr. 17). Notably, Dr. Bergsten's assessment was issued in August 2006 and therefore was not based on a complete record as it did not include any of the subsequent records from Dr. Khosla and Ms. Boner. The ALJ's reliance on a single non-examining state agency report, to the exclusion of the later evidence entered into the record, highlights the ALJ's failure to account for the fluctuations in plaintiff's level of functioning over time.

Moreover, it is clearly established law that the opinion of a non-treating "one-shot" consultative physician or of a medical advisor cannot constitute substantial evidence to overcome the properly supported opinion of a physician who has treated a claimant over a period of years. *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). Dr. Bergsten's assessment, which is consistent with the ALJ's RFC determination, does not constitute substantial evidence so as to overcome the properly supported opinions of plaintiff's psychiatrist and therapist who have treated plaintiff over a period of years.

Accordingly, the undersigned finds that the ALJ improperly weighed the medical evidence in assessing the weight to accord the opinions of Dr. Khosla and Ms. Boner. This matter should be remanded for further proceedings so that the ALJ can properly evaluate the medical evidence of record in accordance with agency regulations and controlling law.

### B. Dr. Kenford's Evaluation

In July 2006, plaintiff was seen by Dr. Kenford, a consultative psychologist, for an evaluation. (Tr. 243-49). Dr. Kenford diagnosed major depressive disorder, recurrent; history of bipolar disorder, controlled by medication; history of psychotic symptoms, controlled by medication; and social phobia. Dr. Kenford assigned plaintiff a GAF score of 15. She noted that plaintiff presented a "difficult diagnostic picture." (Tr. 247). She opined that plaintiff had a significant impairment in her ability to relate to others and in her ability to handle the stress of a work environment. (Tr. 248). Dr. Kenford also opined that plaintiff had the ability to perform simple repetitive tasks and even two-or-three part tasks, but was not able to apply those skills. *Id.* Plaintiff's ability to maintain attention, concentration and persistence was below expected levels. *Id.*

In his decision, the ALJ gave no weight to Dr. Kenford's GAF score noting that her reported GAF score of 15 "indicates an impairment of highly disabling severity" and is therefore inconsistent with the other substantial evidence and Dr. Kenford's own evaluation. (Tr. 16). Notably, the DSM-IV categorizes individuals with scores of 11-20 as having "Some danger of hurting self or others (e.g., suicidal attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." There is no evidence in the record suggesting that plaintiff's mental impairments resulted in such severe symptoms. 20 C.F.R. § 404.1527(d)(2). Notably, plaintiff's treating sources assigned GAF scores ranging from 51-60, which indicate moderate symptoms. (Tr. 199, 230).

Even if the ALJ's decision rejecting Dr. Kenford's GAF score is substantially supported, however, the ALJ erred by not considering the balance of Dr. Kenford's report in assessing plaintiff's disability claim.  The Court recognizes that because Dr. Kenford was not a treating source, her opinion is not entitled to any special deference.  *See* 20 C.F.R. § 416.927(d)(2); *Kornecky v. Commissioner*, 167 F. App'x 496, 506-07 (6th Cir. 2006).  Nevertheless, in determining how much weight to give to the medical source statements in the record, the ALJ must consider "factors including the length and nature of the treatment relationship, the evidence that the [examiner] offered in support of her opinion, how consistent the opinion is with the record as a whole, and whether the [examiner] was practicing in her specialty." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); *see also* 20 C.F.R. § 416.927(d).  The record demonstrates that the ALJ failed to consider the balance of Dr. Kenford's opinion, aside from Dr. Kenford's GAF score, as well as the relevant regulatory factors in determining the weight to afford Dr. Kenford's opinion.  Notably, the state agency psychologists credited and relied, in part, on Dr. Kenford's report in their assessment of plaintiff's functional capacity.  Thus, the ALJ erred to the extent the ALJ failed to consider any portion of Dr. Kenford's report besides her GAF assessment.

## II.  The ALJ erred in assessing plaintiff's credibility.

Plaintiff also contends the ALJ's credibility finding is not supported by substantial evidence.  The ALJ found that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms are not credible to the extent that they are inconsistent with plaintiff's RFC.  In his decision, ALJ Flynn questioned plaintiff's credibility because she was able to attend some sporadic social events, cook, clean, attend to her hygiene, shop for groceries

29

once per week, and socialize with her family. (Tr. 15). The ALJ further noted that plaintiff has

been able to hold employment in the past despite her problems and that her condition appears to

be affected by her divorce in 2005. (Tr. 15). The ALJ also cited to records from Core Behavior

in 2005 which indicated that plaintiff was going to start working for an organization that

provided care for special needs individuals and records from 2006 showing that plaintiff worked

one day a week hanging drapes for a friend in contravention of plaintiff's testimony that she only

worked cleaning houses. (Tr. 14).

According to 20 C.F.R. § 404.1545(b), to qualify for disability benefits a claimant must

be able to engage in employment activities on a "regular and continuing basis." The activities of

daily living described by a claimant do not equate to the ability to work on a "regular and

continuing basis." *See* 20 CFR § 404.1572(c) ("Some other activities: generally we do not

consider activities, like taking care of yourself, household tasks, hobbies, therapy, school

attendance, club activities, or social problems, to be substantial gainful activities.").

With respect to the alleged inconsistency regarding plaintiff's ability to engage in daily

activities, none of the plaintiff's activities of daily living are indicative of her being able to work

on a regular and continuing basis. The activities plaintiff indicated she was capable of are all

activities which can be done at one's own pace. Notably, the record indicates that plaintiff

worked only one to two days per week cleaning houses. (Tr. 188, 199)[6]. Thus, plaintiff's ability

to engage in daily activities does not establish *ipso facto* that she is able to engage in gainful

activity 40 hours per week. The ALJ erred by selectively relying on plaintiff's testimony

---

[6] The record contains a single notation that plaintiff worked one day a week helping her friend
hang drapes for "no pay." (Tr. 188).

regarding her daily activities. *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) ("[A]
person's ability to engage in personal activities such as cooking, cleaning, and hobbies does not
constitute substantial evidence that he or she has the functional capacity to engage in substantial
gainful activity."). It has long been established in the Sixth Circuit that a claimant's ability to
perform limited and sporadic tasks does not mean she is capable of full-time employment. *See
Miracle v. Celebreeze*, 351 F.2d 361, 379 (6th Cir. 1965) ("Intermittent sporadic or infrequent
activity does not constitute [the] ability to engage in substantial, gainful activity precluding
establishment of disability under [the] Social Security Act."). *See also Carradine v. Barnhart,*
360 F.3d 751, 755 (7th Cir. 2004); *Vertigan v. Halter,* 260 F.3d 1044, 1050 (9th Cir. 2001).

  The ALJ also discredited plaintiff's complaints relating to her mental impairments
because "her condition appears to be affected by a divorce which occurred in 2005." (Tr. 14).
Such a finding clearly indicates that the ALJ inserted his own non-medical opinion as to what
defines depression, and what stressors appropriately cause depression. This was clear error. The
undersigned does not dispute that it is the ALJ's prerogative to resolve conflicts and weigh the
evidence of record. However, it appears in making this determination, the ALJ, in part,
impermissibly acted as his own medical expert. *See Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th
Cir. 1985); *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983); *Lund v. Weinberger*, 520 F.2d
782, 785 (8th Cir. 1975). While an ALJ is free to resolve issues of credibility as to lay testimony,
or to choose between properly submitted medical opinions, he is not permitted to make his own
evaluations of the medical findings. *See McBrayer v. Sec'y of Health & Human Servs.*, 712 F.2d
795, 799 (2d Cir. 1983); *Filocomo v. Chater*, 944 F.Supp. 165, 170 (E.D.N.Y. 1996).

More importantly, plaintiff's testimony regarding her limitations associated with her mental impairments is supported by the assessments and treatment notes from Dr. Khosla and Ms. Boner as discussed above.  To the extent the ALJ failed to consider the restrictions imposed by Dr. Khosla and Ms. Boner and to articulate the reasons for rejecting such limitations, the ALJ's credibility finding on this same issue is not supported by substantial evidence.

### III. The decision fails to indicate that the ALJ properly considered all of plaintiff's impairments in formulating plaintiff's RFC.

Lastly, plaintiff asserts that the ALJ failed to properly evaluate and consider plaintiff's "learning disabilities in reading and mathematics" as well as her gastric problems, tremors and fatigue in determining plaintiff's RFC.  Specifically, plaintiff maintains that the record contains numerous citations to plaintiff's difficulty with reading, writing, and mathematics, and that such limited knowledge causes her a great deal of embarrassment and social anxiety.  (Tr. 217-242, 244-246, 356-435).  Plaintiff argues that the record contains evidence indicating that she frequently complained of gastro-intestinal distress, including nausea, vomiting, and abdominal pain, and a CT revealed signs of diverticulosis.  (Tr. 207, 273, 285, 293, 297-298, 301-303, 406). Plaintiff further asserts that the ALJ failed to consider the side effects of her medication which include severe and pervasive fatigue (Tr. 189-193, 198, 208, 231, 237, 390, 411), as well as tremors of the left arm and both legs.  (Tr. 187, 357-358, 360, 400, 402, 419, 423-424).

With respect to plaintiff's cognitive abilities, the undersigned recognizes that Ms. Boner frequently noted plaintiff's cognitive limitations; however, the record does not contain any standardized test scores from plaintiff's school years nor does the record contain any formal intelligence testing of plaintiff's cognitive functions.  Because this matter should be remanded for further proceedings in light of the ALJ's failure to properly consider the medical evidence of

32

record, on remand the ALJ should obtain plaintiff's school records and a consultative mental examination which includes formal intelligence and IQ testing. Thereafter, the ALJ should properly reevaluate plaintiff's mental impairments considering the entire record.

Additionally, as noted by the Commissioner, the record does not contain any medical evidence showing that plaintiff's diverticulitis produced any symptoms or causes any work-related limitations or any objective medical findings relating to plaintiff's complaints of tremors. Notably, a mere diagnosis or catalogue of symptoms does not indicate functional limitations caused by the impairment. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146,151 (6th Cir. 1990) (diagnosis of impairment does not indicate severity of impairment).

However, the ALJ's decision fails to indicate whether he considered plaintiff's gastric problems and side effects caused by her medication including tremors and fatigue. As such, the Court is unable to engage in meaningful review of the ALJ's decision in this regard. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (The Court cannot uphold the decision of an ALJ, even when there may be sufficient evidence to support the decision, if, "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("[M]eaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence").

For these reasons, the Court finds the ALJ failed to properly consider all of plaintiff's impairments in formulating plaintiff's RFC. Therefore, the ALJ's RFC decision is not supported by substantial evidence.

**IV. This matter should be remanded for further proceedings.**

A sentence four remand provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and where further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). In a sentence four remand, the Court makes a final judgment on the Commissioner's decision and "may order the Secretary to consider evidence on remand to remedy a defect in the original proceedings, a defect which caused the Secretary's misapplication of the regulations in the first place." *Faucher,* 17 F.3d at 175.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher,* 17 F.3d at 176. This matter should be remanded for further proceedings. On remand, the ALJ should properly evaluate plaintiff's impairments in light the evidence of record, properly determine the weight to be accorded to the opinions of plaintiff's treating and examining sources, and clearly articulate the rationale in support thereof, and reconsider plaintiff's RFC and credibility assessment.[7]

Additionally, on remand, the ALJ should be mindful of the Sixth Circuit's recent decision in *Ealy v. Commissioner of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010), wherein the Court held that a hypothetical question limiting the claimant to simple, unskilled, routine jobs did not

---

[7] As detailed above, in order to properly evaluate plaintiff's mental impairments, the ALJ should obtain plaintiff's school records and a consultative mental examination which includes formal intelligence and IQ testing. Thereafter, the ALJ should properly reevaluate plaintiff's mental impairments considering the entire record.

34

sufficiently account for moderate deficiencies in concentration, persistence, and pace.  Here, the ALJ adopted the finding of Dr. Bergsten that plaintiff had moderate difficulty maintaining concentration, persistence or pace in light of her lowered stress threshold and her significantly impaired memory.  (Tr. 11).  However, the ALJ's hypothetical question(s) to the vocational expert does not clearly identify an individual with such moderate limitations.  (Tr. 58-61).

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/5/2011_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BEVERLY BARNHORST,
     Plaintiff

     vs

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant

Case No. 1:10-cv-526
Dlott, J.
Litkovitz, M.J.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Am,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).